IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ARNULFO GARZA

        **Plaintiff,**

vs.                                  No. CIV 02-0382 LH/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court upon the Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision filed August 27, 2002 *(Doc. 10)*.  Defendant filed a Response on August 19, 2002 *(Doc. 12)*.  Plaintiff filed his Reply on September 10, 2002 *(Doc. 13)*.  The Commissioner of Social Security issued a final decision finding that Plaintiff was no longer disabled, and thus no longer entitled to disability insurance benefits and supplemental security income.  The United States Magistrate Judge, having considered the Motion, the Response, the Reply, the memoranda, the administrate record, and the applicable law, finds that Plaintiff's Motion is well-taken and should be GRANTED.

## PROPOSED FINDINGS

1.      Plaintiff filed his original application for disability insurance benefits and supplemental security income on March 13, 1990, alleging disability due to low back pain.  R. 378, 382.  The Commissioner denied Plaintiff's claim on June 5, 1990. R. 53.  Plaintiff submitted

a request for reconsideration on September 10, 1990.  R.65.  Upon Plaintiff's request for reconsideration,  Plaintiff's original and additional evidence was reevaluated.  R.56.  The commissioner found the previous determination denying Plaintiff's claim was proper under the law.  *Id*.  Upon Plaintiff's request, a hearing was scheduled for March 4, 1991.  R. 46, 44.  Another  hearing was scheduled for September 25, 1991. R. 42.  An administrative law judge (hereinafter, "ALJ") found Plaintiff entitled to disability benefits commencing September 15, 1988. R. 381.

2.       After a Continuing Disability Review, Plaintiff was notified by letter on July 21, 1997 that his benefits would be terminated.  R. 396.  A hearing was held on November 5, 1997 before a Disability Hearing Officer. R. 412-422.  The Hearing Officer issued an unfavorable decision on November 18, 1997.  R. 435.

3.       Plaintiff thereafter submitted a request for hearing by an administrative law judge on December 21, 1990.  R. 58; R. 440-445.   The ALJ issued an unfavorable decision on October 20, 1999.  R.20.   Plaintiff requested review of the hearing decision/order on November 3, 1999.  R. 17.  Plaintiff submitted a request for review of the ALJ's decision by the Appeals Council on November 1, 2000.  R. 12 .The Appeals Council denied Plaintiff's request for review of the ALJ's decision on February 22, 2002.  R. 6-7.

4.       On April 4, 2002*,* Plaintiff commenced this action, seeking judicial review of the Commissioner's decision finding Plaintiff no longer disabled as of July 1, 1997.  Compl. ¶¶ 1-5.

## STANDARD OF REVIEW

5.       This Court may only review the Commissioner's decision to determine whether it is supported by substantial evidence and whether correct legal standards were applied. *See Shepherd*

*v. Apfel,* 184 F.3d 1196, 1199 (10th Cir. 1999);  *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.

1994). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Soliz v. Chater,* 82 F.3d 373, 375 (10th Cir. 1996) (quoting

*Richardson v. Perales,* 402 U.S. 389, 401, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971) (further

quotation omitted)). The Court may "neither reweigh the evidence nor substitute [its] judgment

for that of the Commissioner." *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800

(10th Cir. 1991).  A decision by an ALJ is not supported by substantial evidence if the evidence

supporting the decision is overwhelmed by other evidence on the record.  *See Gossett v. Bowen*,

862 F.2d 802, 805 (10th Cir. 1988).

6.      In order to qualify for supplemental security income, a claimant must establish a

severe physical or mental impairment expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months which prevents the

claimant from engaging in substantial gainful activity.  *See Andrade v. Secretary of Health &

Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1995)(citing 42 U.S.C. §§ 1382c (a)(3)(A)).  At

the first four levels of the sequential evaluation process, the claimant must show that he is not

engaged in substantial gainful employment, he has an impairment or combination of impairments

severe enough to limit his ability to do basic work activities, and his impairment meets or equals

one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404,

Subpt. P, App. 1, or he is unable to perform work he has done in the past.  20 C.F.R. §§

404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the

Commissioner to show that the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience.  *Id.*

7.      After a claimant has been receiving disability benefits for some period, the Social

Security Administration is required to review the claimant's case periodically, to determine

whether the claimant's benefits should be terminated.  *Shepherd*, 184 F.3d at 1199; 20 C.F.R. § 404.1594 (a).   To terminate a claimant's benefits, the Commissioner must show: that the claimant's medical condition has improved; that the improvement is related to his ability to work; and that the claimant is currently able to engage in substantial gainful activity.   20 C.F.R. § 404.1594.   Medical improvement is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision" that claimant was disabled or continue to be disabled".  20 C.F.R. § 404.1594(b)(1).  A determination that there has been a decrease in medical severity must be based on improvement in the signs, symptoms, and/or laboratory findings associated with the claimant's impairments.  *Id*.  Medical improvement is not related to the claimant's ability to do work if there has been a decrease in the severity of the impairments, "but no increase in [claimant's] functional capacity to do basic work activities."  20 C.F.R. § 404.1594(b)(2).  If any medical improvement is not related to the claimant's ability to do work, benefits will continue.  *Id*.

**Administrative Record**

8.     The most recent favorable decision was the ALJ decision issued on November 4, 1991, the comparative point decision ("CPD").  *See* R. 377-382.  On November 4, 1991, an ALJ issued a favorable decision, finding that Claimant was disabled and unable to work.  R. 375-382. The ALJ noted that Claimant's vocational expert had found him to be functionally illiterate and found him to have significant restrictions on his capacities for sitting, standing, walking, bending and fine motor coordination.  R. 379.  The ALJ noted that Mr. Garza had testified at his hearing on September 25, 1991 that he cannot read.  R. 379.  The ALJ found that Mr. Garza had not engaged in substantial gainful activity since September 15, 1988.  R. 381.  The ALJ found that Claimant had the following impairments:  chronic, severe low back pain and occasional lower extremity radiculopathy; and chronic cervical strain with associated chronic headaches.  *Id*.  The ALJ found that these impairments did not meet or equal an impairment in the Listing of

4

Impairments. *Id*. The ALJ found that Mr. Garza had a residual functional capacity for less than a full range of sedentary work, and that he could not perform his past relevant work as a truck driver. R. 381. The ALJ further found that although Claimant, a younger individual, had completed the twelfth grade, he "apparently is illiterate in the English language." *Id*. The ALJ relied upon vocational expert testimony, which confirmed that "there are not and have not been jobs existing in significant numbers in the regional or national economies which the claimant could perform." *Id*. The ALJ concluded that Mr. Garza was entitled to a period of disability commencing on September 15, 1988, at least through the date of decision, March 13, 1990. R. 382. The ALJ recommended that Claimant's disability status be reevaluated within one year of the date of his decision. R. 382.

9.      Claimant completed a Report of Continuing Disability Interview on May 1, 1997. R. 386-394. In this form, Mr. Garza noted that he had "more pain" and "sleepless nights because of pain." R. 385. Claimant named Dr. Barkalow (his chiropractor) as his medical treatment provider for the previous twelve months. R. 386. In the Report of Continuing Disability Interview, Mr. Garza described his daily activities, and noted that he "walk[s] a lot with no assistance. Read[s]." R. 388.  He stated that he sometimes cooks and dusts the furniture, goes fishing about twice a month, has friends over for visits a couple of hours a week, and drives his car to town several times a week. R. 389. Claimant stated it was more difficult for him to do simple duties "due to more pain in the back and legs." R. 390. The form was completed in English. *See* R. 385-394.

10.      Claimant was notified by letter on July 21, 1997 that his benefits would be terminated. R. 396. The letter stated that medical evidence showed that Mr. Garza no longer required treatment for constant pain, no longer seemed to have chronic headaches, was able to move about without assistance, and admitted to light duty activities of daily living. R. 396. Claimant submitted a Request for Reconsideration - Disability Cessation on August 24, 1997.

Mr. Garza described his disabling condition as "chronic low back pain and neck strains" with "chronic headaches" accompanied by a burning sensation and weakness in his legs, leaving him in pain about 90% of the time. R. 404. Mr. Garza stated that his headaches had gotten worse, his eyesight had deteriorated, and his ankles had started to hurt and swell. *Id.* In completing his Request for Reconsideration, Claimant stated that he often needs help getting up from a sitting or lying position. R. 406. He stated that he could walk unaided, but only for about ten to fifteen minutes before needing to sit and rest. *Id.*

11.     A consultative examination was performed by Gwen Y. Sun, M.D. on July 7, 1997. R. 461. In her report, Dr. Sun indicated in the Social History portion that Claimant's last employment was in 1993 as a DOT tuck driver and a truck mechanic; and that Claimant's daily activities included fishing, walking with the dogs, and feeding the chickens. R. 462. Dr. Sun noted that Mr. Garza walked with a normal gait and was wearing 1½ inch-heeled cowboy boots. R. 462. Dr. Sun also related that Claimant stated that in 1987 he suffered a worker's compensation injury while working for Exxon and after a traumatic injury, he was paralyzed for a week from the waist down. R. 461. Dr. Sun noted that Mr. Garza claimed that he was not hospitalized for this injury. *Id.* Dr. Sun noted that this was "inconceivable." *Id.*

12.     Dr. Sun describes a physical examination including a cardiovascular exam (regular rate and rhythm with negative murmur), pulmonary exam (clear to auscultation in all quadrants), dermatological examination (noting the scar on Claimant's left femur and noting no skin breakdown or cellulitis), musculoskeletal exam of his neck (finding full range of motion and negative tenderness), an exam of the upper extremities (negative radiculopathy), examination of the lumbar spine, exam of the lower extremities, and a neurological exam (finding motor, sensory and cerebellar all within normal minutes). R. 462. Dr. Sun noted that she asked Mr. Garza whether he felt there might be a need for x-rays to evaluate his current condition, and further noted that Mr. Garza indicated there was really not much change in his condition, and he did not

feel that x-rays needed to be done.  R. 462-463.  Dr. Sun concluded her report with her diagnosis, wherein she noted that Claimant's  back condition and his neck condition are essentially quite stable and is [*sic*] a non issue at this point."  R. 463.  Dr. Sun found no specific limitations in terms of Mr. Garza's physical activity, except for the most laborious physical employment.  *Id*. Dr. Sun noted that Claimant's left femur fracture was also quite stable and a non-issue.  *Id*.

13.     Melvin L. Golish, M.D., performed a Physical Residual Functional Capacity (hereinafter, "RFC") Assessment of Mr. Garza on October 7, 1997.  R. 469-478.  Basing his conclusions on all the evidence in Mr. Garza's file, Dr. Golish formed an opinion as to Mr. Garza's RFC.  *See* R. 469.  Dr. Golish concluded that Claimant could occasionally lift 20 to 40 pounds; could frequently lift 10 to 15 pounds; could stand or walk or sit about six hours of an eight-hour workday; had no limitations on pushing or pulling.  R. 470.  Dr. Golish found no postural, manipulative, visual, communicative, or environmental limitations.  R. 471-473.

14.     A hearing was held before a Disability Hearing Officer on November 5, 1997.  R. 412-422.  At the time of the hearing, Mr. Garza[1] indicated that he took Advil® for pain, and that the medication sometime helped his migraine headaches, but sometimes did not.  R. 415.   Mr. Garza stated that he had not seen a doctor in about a year and half because he did not trust the Socorro doctors.  R. 415.  In describing his activities, Claimant noted that he usually wakes at 4:00 a.m., walks around with his dogs, sometimes fixes breakfast for the family, watches TV, walks outside some more, then does the laundry or the dishes.  R. 416.  Claimant noted that he does not run the vacuum cleaner.  *Id*.  He stated that rides in his truck to visit friends.  *Id*.  In the afternoon, Claimant stated that he watches TV and cares for his fighting chickens which he raises and sells or gives away.  *Id*.  Claimant stated that he goes fishing at Elephant Butte about once a month.  *Id*. Claimant noted that he does not cook as much as he used to.  R. 417.  Claimant stated

---

[1]     Although the report of the Hearing Officer indicates that Mr. Garza testified as to these matters, Mr. Garza later refuted all of these statements.  *See, e.g.,* R. 438.  I address the issue of these refuted statements elsewhere in this opinion.

that he has three pickup trucks which he drives three times a week.  *Id*.  Claimant stated that he

goes shopping every other week, and is able to carry light items.  *Id*.  Claimant said that he goes

to bed around 8 or 9:00 p.m., but sometimes wakes because of back pain.  *Id*.   Claimant stated

that he likes to work on guns and fishing rods and sometimes goes hunting.  R. 423.  Mr. Garza

indicated that he can walk about a half a mile, stand 15-20 minutes, sit about 30 minutes, and lift

15 to 25 pounds.  R. 418.  He noted that he has to squat rather than bend, that upper arm

reaching causes neck pain, and that his fingers sometimes get numb on the tips when his back is

hurting.  R. 418.  Claimant also noted that he sometimes has blurry vision.  *Id*.  Claimant

described depression as a mental limitation, for which he has not sought treatment.  *Id*.

> 15.     Among her observations, the Disability Hearing Officer noted:

> Claimant did alternate between standing and sitting, although he did appear to be
> able to sit for extended periods and did not exhibit any signs of discomfort
> standing or sitting.  When standing, he did not pace or move his positioning, such
> as is common with back injuries. . . .  The claimant was not entirely credible in
> stating his limitations due to back impairment.  No matter what activities I
> questioned him about, he expressed limitations but his only reason for not seeing
> doctors about his problems was he did not like Socorro doctors.

R. 421-422.  The Disability Hearing Officer noted that although Mr. Garza had testified that he

has limitations to a majority of motor activities, he also "reported a wide variety of daily activities

that involve those same motor functions."  R. 428.   The Disability Hearing Officer noted that

although an interpreter was provided to allow Claimant's wife to testify, she did not testify.  R.

422.  There is no indication that the hearing was not in English.  *See generally*, R. 425-433.

> 16.     The Disability Hearing Officer found that the Claimant sustained a back sprain

from falling from a truck which aggravated a mild lumbar abnormality, suffered from occasional

migraine headaches that distort his vision, and alleged depression, for which he had sought no

medical treatment.  R. 428.  The officer noted that Mr. Garza reports that he cannot read or write

English, although the Hearing Officer observed that prior to the hearing, "the claimant looked

over his claims file and did not appear to be having problems with reading it."  R. 428.  The

hearing officer found that Mr. Garza did not have a severe mental impairment. *Id*. The Hearing Officer concluded that Mr. Garza has the physical capacity to lift and carry ten pounds frequently and twenty pounds occasionally; that he has to capacity to sit or stand and walk for up to six hours out of an eight-hour day, and that he should avoid constant bending and twisting. *Id*. The Hearing Officer found that Claimant has the residual functional capacity to do light work. *Id*.

17.    In setting forth her decision, the Hearing Officer noted that Mr. Garza is not engaging in substantial gainful activity, that claimant does not impairments which meet or equal a current listed impairment, and that there has been medical improvement of the impairments since the comparison point decision. R. 429.  The Hearing Officer specifically noted at step 4 that claimant has few restrictions to daily activities, sees his chiropractor infrequently, and that the symptoms of depression reported are not severe and Claimant has not sought medical treatment for them. *Id*.  The Hearing Officer found that the medical improvement related to Mr. Garza's ability to do work. R. 430.  The Hearing Officer characterized Mr. Garza's impairment as severe, because it "results in more than minimal limitation to his ability to lift and carry and bend." R. 430.  Based on this impairment, the Hearing Officer found that Claimant had the RFC to do light work. R. 431.  Noting that this prevented Mr. Garza from doing his past relevant work, the Hearing Officer proceeded to Step 6, nothing that Claimant was 45 years old, defined as a younger person by 20 C.F.R. 404.1563 who has relevant work experience. R. 431.  The Hearing Officer noted that  Mr. Garza has had only sporadic, unskilled work, and therefore applied 202.20[2] of the GRIDS, directing that a claimant who is a younger worker with a high school education and the physical capacity to do light work is not disabled. R. 432 (citing 20 C.F.R. 404.1566)

18.    Mr. Garza was notified by letter on November 18, 1997 of the decision of the

---

[2]    Section 202.20 of 20 C.F.R. Part 404, Subpt. P, App. 2 applies  to a younger individual, who is at least a high-school graduate, whose previous work experience is "unskilled or none."

Hearing Officer.  R. 435.  Mr. Garza thereafter requested a hearing before an Administrative Law

Judge.  R. 440-445.

19.     Dr. Reid, Mr. Garza's treating physician, completed a Statement of Ability to Do

Work-Related Physical Activities on March 9, 1998.  R. 477.  In this Statement, Dr. Reid noted

that Mr. Garza could occasionally lift less than 10 pounds, could frequently lift and/or carry ten

pounds, could stand or walk less than two hours in an eight-hour workday, could sit less than six

hours in an eight-hour workday, and was limited in his ability to push and/or pull with his lower

extremities.  R. 477.

20.     Dr. Reid completed a second Statement of Ability to Do Work-Related Physical

Activities on July 5, 1999.  R. 496.  Dr. Reid stated that Claimant could occasionally lift 10 to 20

pounds, could frequently lift and/or carry less than ten pounds, could stand and/or walk at least

two hours in an 8-hour workday, and must periodically alternate sitting and standing to relieve

pain or discomfort.  *Id.*  Dr. Reid further noted only limited ability to push and/or pull with the

upper and lower extremities, stating that use of the extremities "causes pain."  *Id.*  Dr. Reid stated

that all of Mr. Garza's activities are restricted due to pain.  R. 496.  With regard to Mr. Garza's

mental limitations, Dr. Reid found that Claimant's understanding and memory[3] was moderately to

severely impaired, but did not preclude employment.  R. 497.  Dr. Reid similarly found that

Claimant's sustained concentration and persistence[4] was limited moderately or severely, but did

not preclude employment.  *Id.*   Dr. Reid stated that Claimant's social interaction[5] and

--------

[3]     Including the ability to remember locations and work-like procedures.  R. 497.

[4]     Including the ability to carry out very short and simple instructions, to perform
activities within a schedule, to sustain an ordinary routine without special supervision, and to
make simple work-related decisions.  R. 497.

[5]     Including ability to interact appropriately with the general public, to ask simple
questions or request assistance, to get along with coworkers or peers, and to maintain physically
appropriate behavior and to adhere to basic standards of neatness and cleanliness. R. 498.

adaptation[6] were also limited moderately or severely, but did not preclude employment.  R. 498.

21.     In a July 27, 1999 letter to Claimant's attorney, Dr. Reid answered four specific questions.  *See.* R. 523.  First, Dr. Reid noted that he has been treating Mr. Garza off and on for various medical complaints since 1981.  R. 523.  Second, Dr. Reid addressed the question of whether Mr. Garza was credible in the pain he expresses by noting that "It appears to me when I see Mr. Garza in the office he is able to walk into the office and out of the office without pain, but I do believe that Mr. Garza has chronic pain which is aggravated by most activities."  *Id.*  Third, Dr. Reid stated:  "I do not think that Mr. Garza is depressed at this time."  R. 523.  Finally, Dr. Reid addressed the question of whether "Mr. Garza is restricted from working at the present time."  *Id.*  Dr. Reid stated that Claimant is restricted from any work requiring heavy physical work with a lot of lifting, from work that would involve repeated bending or stooping, and from work which involves chronic sitting in one position without moving.  *Id.*  Dr. Reid concluded:  "I believe Mr. Garza has significant work restrictions but I am not convinced that he is totally unable to work should an appropriate job be found."  R. 523.

22.     At the hearing before the ALJ, Claimant's attorney argued that the report by the consultative examiner, Dr. Gwen Sun, should be given little, if any weight because Claimant alleged that the social history portion was inaccurate and Claimant further claimed that Dr. Sun's examination was very short in duration.  R. 528.  However, Claimant's complaints about Dr. Sun's report are similar to his complaints about the Hearing Officer's report – he contends that both Dr. Sun and the Hearing Officer described him as listing various activities, which he claims he cannot do and has never stated that he can do.  *See*, *e.g.,* R. 528, 541, 554-558.

23.     Mr. Garza testified that he could sit "[a]nywhere from five to ten minutes at the most."  R. 533.  Claimant stated that he could walk for "about a half a block" and could stand at

---

[6]     Including ability to respond appropriately to changes in the work setting, being aware of normal hazards and taking appropriate precautions, and traveling in unfamiliar places or use public transportation. R. 498.

one time for "about eight minutes."  R. 533.    Claimant testified that he could lift "about five, six

pounds."  R. 534.  Claimant first stated that he could climb a flight of stairs "real slow" but then

stated that he could not finish climbing a flight of stairs.  R. 534.  Claimant stated that he could

not use his hands above his shoulders at all.  R. 534.  Claimant testified that he could not kneel

and get back up without using his hands, and that he could only squat for less than two minutes

and required support to get back up.  R. 535  Claimant testified that he could bend forward from

the waist about a quarter of the way, until he got pain in his back.  R. 535.   Claimant stated that

he was in pain all the time, and that on a scale of one to ten, ten requiring that Claimant go to the

hospital for pain, Claimant's pain level was generally about an eight.  R. 536.  Claimant testified

to taking ibuprofen or Advil for pain.  R. 538.

     24.    Claimant's testimony at the July 14, 1999 hearing before the ALJ  may be

compared with the statements included in the Report on Continuing Disability dated May 1, 1997,

Mr. Garza described his daily activities, noting that he "walk[s] a lot with no assistance", reads,

sometimes cooks and dusts the furniture, goes fishing about twice a month, has friends over for

visits a couple of hours a week, and drives his car to town several times a week.  R. 388-389.   At

the hearing before the ALJ on his continuing disability determination, Mr. Garza claimed that he

never read the Report on Continuing Disability, doesn't remember it, and doesn't remember

signing it. R. 574.

     25.    Similarly, although the Hearing Officer specifically noted her observation that "the

claimant looked over his claims file and did not appear to be having problems with reading it,"

Mr. Garza testified before the ALJ he did not look over or read his claims file.  *See*  R. 428, R.

522.

     26.    Claimant testified before the ALJ that in the morning he gets up and washes up and

cleans up.  R. 539. He stated that he has no hobbies, does not take care of the house, naps up to

three times a day and has trouble sleeping at night because of his back pain.  R. 539-540.

However, Mr. Garza's medical records from Dr. Reid  dated January 27, 1999 include a note of an injury sustained while chiseling some metal.  R. 501.  Claimant testified that he walks with a limp, because of pain.  R. 540.   Dr. Sun's report notes that Mr. Garza walked with a normal gait. R. 462.  Dr. Reid, Claimant's treating physician, noted that Mr. Garza would walk in and out of his office without pain.5. 523.

27.     Claimant claims that he does not do the shopping, and does not do the cleaning at all.  R. 545.   He stated that he does not cook or clean the house.  R. 546.   The Hearing Officer reported that Mr. Garza testified that he sometimes fixes breakfast for his family, and sometimes does the laundry or dishes.  R. 416.  The Report of Continuing Disability Interview indicated that Plaintiff included cooking and dusting the furniture among his activities.  R. 389.  Although Claimant testified before the ALJ that he does not cook or clean the house, Claimant's daughter testified that sometimes her father does the cooking.  *Compare* R. 546, 562.   Although Claimant testified before the ALJ that he does not do the shopping, the Disability Hearing Officer noted that Claimant reported that he goes shopping every other week and is able to carry light items.  R. 417.

28.     Claimant testified that he suffered from depression since two years from the date of his accident.  R. 547.   However, Dr. Reid opined that Claimant is not depressed.  R. 523. Claimant testified that he drives once a week.  R. 548.   Claimant testified that he has never raised fighting cocks.  R. 549.  Claimant's daughter, Yesenia Garza, testified that there are ducks and chickens on the property, cared for by Claimant's sons.  R. 559.   Claimant testified that he has no hunting dogs, but then testified that he has dogs on the property, which are not hunting dogs.  R. 549.   The Report on Continuing Disability Interview stated that Claimant walks without assistance; Dr. Sun's report states that Claimant reported walking the dogs as a daily activity.  R. 388, 462. Claimant's daughter testified that the family did have hunting dogs, but they had been gone a couple of years.  R. 560.

29.     Claimant stated that he hasn't gone fishing in 17 years.  R. 550.   Mrs. Marta Nata Garza, Claimant's wife, testified that Claimant had gone fishing seven or eight years ago.  R. 566. The Report on Continuing Disability Review stated that Claimant goes fishing twice a month.  R. 389.  The Disability Hearing Officer reported that Claimant testified to going fishing at Elephant Butte about once a month.  R. 417.

30.     Claimant testified that he cannot read, and that he did not look through his file when he went to the Social Security Office.  R. 552.  Claimant testified that his daughter reads the notices which he receives from Social Security and his daughter writes the responses.  R. 552. Claimant testified that he gets up at 6:30 or 7:00 in the morning.  R. 553.

31.     Mr. Garza testified that he has been a truck driver since he was 16, and that when he obtained his truck driver's license he was not required to pass a written test.  R. 569.  Mr. Garza testified that he never did any paperwork when he worked a truck driver.  R. 569.  Mr. Garza testified that he never had to fill out a truck log, and that he had a team driver or partner who would do the paperwork.  R. 570.  Mr. Garza stated that although he graduated from high school, some of his course were special education.  R. 573.   Mr. Garza claimed that the April 26, 1997 report listing his recreational activities was not read by him, and that he did not remember signing it.  R. 574.

32.     With regard to Dr. Sun's CE, Claimant said that Dr. Sun had "a real snotty attitude. . . . She was in a raunchy mood."  R. 541.  Claimant stated that Dr. Sun did not perform a physical examination and did not do any tests of movement.  R. 542-543.   However, Dr. Sun's records include numerous observations as to range of motion.  *See*, R. 464-465.   Claimant stated that Dr. Sun did not ask him about taking x-rays, that he did not own any cowboy boots.  R. 545. Dr. Sun's notes, however, state that Claimant had indicated that he did not think he needed x-rays.  R. 462-463. In addition, although Mr. Garza stated that Dr. Sun's examination lasted only seven to ten minutes, and included no physical examination, Dr. Sun's report describe a physical

14

examination involving various parts of Mr. Garza's body and included detailed observations.  R. 462-463.

33.     Claimant's apparent distrust of Dr. Sun echoes his previous testimony that he stopped seeing Dr. Altman  because "he got mad at me for some reason."  R. 537.    Claimant argues that Dr. Sun's report, which contains many of the facts contained in the Report on Disability Review Interview and the findings of the Disability Hearing Officer, includes many items fabricated entirely. R. 542-543.  Claimant also apparently distrusts other physicians, having noted to Dr. Sun that he hasn't sought frequent medical treatment for his infirmities because he distrusts the doctors in Socorro.  R. 415.

34     Moreover, Claimant's testimony as to his inability to read or write may be compared with Claimant's own previous statements.  For example, Mr. Garza indicated an October 1989 deposition that he might want to become an electrician and noted that the had taken some courses in electricity when he was in school.  R. 177. The Report of Continuing Disability Interview from May 1, 1997 lists reading as one of Mr. Garza's daily activities.  R. 388. The Reconsideration Report for Disability Cessation from September 18, 1997, lists reading books as one of Mr. Garza's hobbies.  R. 407.  In his October 1989 deposition, Mr. Garza identified a Patient Information Sheet that he had completed at a Dr. Hinkeldey's office.  R. 156.  A copy of this Patient Information Sheet, at page 275 of the Record, indicates that Mr. Garza was able to provide pertinent information in writing about himself, his family, and his medical condition.  *See* R. 275.  Claimant testified that he never did any paperwork, never had to fill out a truck log, and had a team driver or partner who would complete necessary paperwork when he worked as truck driver.  R. 569-570.  However, in his October 1989 deposition, Claimant testified that he and his supervisor Mr. New were the only persons working at Socorro Petroleum who drove trucks.  R. 178.

35.     Claimant's testimony was thus internally inconsistent during his testimony before

15

the ALJ, was inconsistent with his previous deposition testimony, was inconsistent with the Report on Continuing Disability Interview (which he signed), and was inconsistent with his testimony as reported by the Disability Hearing Officer. Moreover, Claimant's testimony that he is depressed is inconsistent with the report of his treating physician, as is his claim that he is unable to work.

36.     A vocational expert ("VE"), Ms. Pamela Bowman, was called to testify. R. 572. The ALJ constructed a hypothetical, asking the VE to consider whether a person with the age, education, and experience that the Claimant had, subject to the limitations set forth by Dr. Sun, could perform any jobs that exist in the national or regional economy. R. 577-578. The VE noted four such jobs. R. 578-579. The ALJ then asked what effect the inability to read or write would have on the availability of jobs. R. 579. The ALJ clarified the degree of literacy by questioning Claimant as to his ability to read numbers. R. 580. The VE testified that limitation would reduce the number of jobs by 50 percent. R. 581-582. The ALJ noted that the doctors' reports were inconsistent, but decided to construe them in Claimant's favor and assume that Claimant could only lift less than ten pounds. R. 585. The VE testified that a person with Claimant's characteristics, with the limitations on lifting and sitting and standing set forth by Dr. Reid, and with Claimant's RFC would not be able to do any of the Claimant's past relevant work. R. 585. The VE also testified that such a person could do only one job, that of surveillance system monitor. R. 585-586. The VE noted that the literacy limitations testified to by the Claimant would have no effect on the job of surveillance system monitor. R. 586. The ALJ presented a final hypothetical to the VE asking whether a person with the vocational profile of the Claimant who cannot read or write at all, who can only walk half a block at a time, who can only sit for five to ten minutes at a time, who can stand for eight minutes at a time, can only climb a few steps and not a flight of stairs, who cannot use his hands above his shoulders, who needs support to get up from kneeling, who can squat for less than two minutes, can bend over about a quarter of the way, and can lift about eight pounds could do a job that exists in the regional or

16

national economy.  R. 587-88.  The VE testified that he could not.  R. 588.

## The ALJ Decision

37.     The ALJ noted that claimant was previously found to be disabled within the meaning of the Social Security Act beginning September 15, 1988 under a favorable decision issued on November 1, 1991 (the comparative point decision, or "CPD").  R. 25.  Claimant's disability was determined to have ceased as of July 1, 1997 based upon medical improvement and the capability for engaging in light work.  R. 25.   The ALJ found that Claimant had not engaged in substantial gainful activity following the CPD.  R. 26.   The ALJ further found that Claimant currently had a "'severe' combination of impairments consisting of the residual effects of a work injury with neck and low back pain, with evidence of a slight disc protrusion, slight displacement of the S1 nerve root and mild facet joint arthritic changes at L4-5 and L5-S1."  R. 26.  The ALJ noted that the impairments present at the time of the CPD "were a combination of impairments including minimal facet joint arthritis, mild degenerative disc disease of the lumbar spine with occasional radiculopathy, chronic cervical and lumbar strain associated with headaches."  R. 31.  Thereafter, the ALJ turned to whether medical evidence established that there had been an improvement in Mr. Garza's medical impairments since the time of the CPD, related to the ability to do work.  R. 31.

38.     The ALJ "must give 'controlling weight' to the treating physician's opinion, provided that opinion 'is well-supported . . . and is not inconsistent with other substantial evidence.'"  *White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2002).  *See also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing 20 C.F.R. §§ 416.927(d)(2));  20 C.F.R. §§ 404.1527(d)(2)).  Dr. Reid opined that Mr. Garza is not depressed, and although he stated that Mr. Garza "has significant work restrictions,"  Dr. Reid concluded that he was not convinced that Claimant was "totally unable to work should an appropriate job be found."  R. 523.  Dr. Reid also addressed the credibility of Mr. Garza's complaints of pain, noting that when he saw the Claimant

at his office, the Claimant was able to walk in and out of the office without pain.  R. 523.

39.     To terminate a claimant's benefits, the Commissioner must show that Mr. Garza's medical condition has improved; that the improvement is related to his ability to work; and that the claimant is currently able to engage in substantial gainful activity.   20 C.F.R. § 404.1594. Medical improvement is defined as "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision" that claimant was disabled or continue to be disabled.  20 C.F.R. § 404.1594(b)(1).

40.     Claimant's condition has improved pursuant to 20 C.F.R. § 404.1594(b)(1).  The record indicates that Claimant has had a decreased need for medical treatment, seeing Dr. Barkalow once or twice a month, and seeing Dr. Reid once a month.  R. 538.  Claimant uses only ibubrofen or non-prescription Advil for pain relief.  R. 583.   In addition, Claimant's treating physician and chiropractor have both opined that Claimant may engage in some kind of employment.  *See* R. 493 and R. 523.  Claimant, who had previously been treated with prescription muscle relaxants, now reports only taking over-the-counter Advil or ibubrofen.  R. 353, 583. The consultative physician opined that Mr. Garza's back and neck conditions  were "essentially quite stable and [were] a non issue at this point," placing no limitation on Claimant, except on "laborious and physical employment." R. 483.

41.     A determination that there has been a decrease in medical severity must be based on improvement in the signs, symptoms, and/or laboratory findings associated with the claimant's impairments.  *Id*.   Medical improvement is not related to the claimant's ability to do work if there has been a decrease in the severity of the impairments, "but no increase in [claimant's] functional capacity to do basic work activities."  20 C.F.R. § 404.1594(b)(2).  If any medical improvement is not related to the claimant's ability to do work, benefits will continue.  *Id*.

42.     In applying the medical improvement test the ALJ must first compare the severity, at that time, of current impairments to the severity of those impairments present at the time of the

18

most recent favorable decision finding the claimant disabled. *Shepherd v. Apfel*, 184 F.3d 1196, 1201 (10th Cir. 1999) (citing 20 C.F.R. § 404.1594(b)(7)). Thereafter, in order to determine that medical improvement is related to ability to work, "the ALJ must reassess a claimant's residual functional capacity (RFC) based on the current severity of the impairment(s)" which were present at the time of the last favorable decision. *Shepherd*, 184 F.3d at 1201 (citing 20 C.F.R. § 404.1594(c)(2)). The ALJ must compare the current RFC with claimant's RFC at the time he was determined to be disabled and may find medical improvement related to an ability to work only if there is an increase in RFC based upon changes in objective medical evidence-signs, symptoms, or laboratory findings. *Id.*

**Residual Functional Capacity**

43.     In making his determination of whether Claimant has shown medical improvement, the ALJ evaluated Claimant's RFC based on the current severity of his impairments. *See* R. 35-38. In assessing Claimant's RFC, the ALJ took into account the Claimant's exertional and non-exertional capacities. R. 36. The ALJ noted that although "the claimant does present with physical impairments I am persuaded reduce his physical capacity to perform work-related activities, but do not preclude them altogether." R. 36. The ALJ found that upon consideration of the Claimant's subjective allegations and the testimony of his wife and daughter, "claimant's residual functional capacity continues to be reduced, but not eliminated." R. 34. The ALJ noted that an evaluation completed by Dr. Barkalow on February 21, 1990 opined that Claimant "could not sit for more than one hour at a time or longer without a break, and more than two to three hours during an 8-hour work day." R. 26 (internal citations omitted).[7] Dr. Barkalow's recent

---

[7]     On March 9, 1990, Dr. Barkalow stated that "Mr. Arnulfo Garza is not physically able to do construction work involving heavy or repeated lifting, pushing, pulling or bending. The guidelines described in the 1-26-89 work capacities guidelines report remain valid and accurate." R. 83. Dr. Barkalow evaluated Claimant's physical capacities, concluding that in an eight-hour work day, Claimant could sit, stand or walk up to an hour at a time; that Claimant could sit or walk up to three hours total, or stand up to two hours total, during an eight-hour day; that

evaluation, completed in November 1997, stated that Claimant "retains the physical capacity to perform some type of gainful activity, but is not able to perform his past work."  R. 27.  After her July 7, 1997 CE, Dr. Sun opined that Claimant had no limitations beyond "laborious and physical employment."  R. 28; 463.  The non-examining, non-treating physician with the state agency, Melvin L. Golish, MD. diagnosed cervical and lumbar pain and found that this impairment limited claimant to the full range of light exertional-level work.  R. 28, 469, 477.  Claimant's own treating physician, Dr. Reid, remarked on July 27, 1999 that Claimant was restricted from any work requiring heavy physical work with a lot of lifting, from work that would involve repeated bending or stooping, and from work which involves chronic sitting in one position without moving.  R. 523.  Dr. Reid concluded that Claimant "has significant work restrictions"  but was "not convinced that he is totally unable to work should an appropriate job be found."  R. 523.

44.     The ALJ found that Claimant, beginning from at least July 1, 1997, had the residual functional capacity for work within the sedentary to light exertional work levels.  R. 36.  The ALJ noted that Claimant's specific limitations included lifting or carrying 20 pounds occasionally and less than ten pounds frequently, standing at least two hours in an 8-hour work day, sitting provided he can change positions throughout the day, and limited pushing and pulling of the upper and lower extremities.  R. 36.   The ALJ noted that the exertional and postural limitations of Dr. Reid "represent[ed] a credible assessment" of Claimant's RFC.  R. 37.  The ALJ's comparison of Dr. Barkalow on February 21, 1990 assessment and the current limitations

---

Claimant could lift up to 10 pounds frequently, and could lift up to 20 pounds occasionally.  R. 86.  The evaluation further stated that Claimant could occasionally  squat, crawl, and reach, but should never bend or climb.  R. 87.  Dr. Barkalow noted no restrictions of activities involving exposure to marked changes in temperature  and humidity or exposure to dust, fumes and gases; and further noted moderate restriction of activities involving unprotected heights and driving automotive equipment.  R. 87.  Dr. Barkalow remarked:  "Although Mr. Garza is now physically able to perform light duty work, he remains precluded from truck driving[,] due to the associated stress of the bouncing on his lumbo-sacral spine.  Accordingly[,] he should also refrain from bending, lifting, and climbing as described above. . . ."  R. 87

of Mr. Garza's RFC indicate that Claimant's RFC had increased.  R. 26, 37, 87, 523.

45.     Claimant relies upon *Patton v. Massanari,* 20 Fed. Appx. 788, 792, 2001 U.S.

App. LEXIS 21497 (10th Cir. October 4, 2001)(unpublished opinion) noting that

> Even if the Commissioner determines that a claimant's condition has improved
> such that he no longer meets a medical listing, he is still required to establish that
> the claimant's functional capacity to do basic work activity has improved to the
> level that he can engage in sustained and substantial gainful activity.

*Patton ,* 2001 U.S. App. LEXIS 21497 **10 (citing *Glenn v. Shalala*, 21 F.3d 983, 987 (10th

Cir. 1994))[8].  In the favorable CPD, the ALJ found that Claimant's impairments, singularly or in

combination, were not severe enough to meet or equal an impairment in the Listing of

Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  R. 378.  Although *Patton* is not controlling in

this case, the ALJ made the necessary comparison between Claimant's RFC at the time of the

CPD and his current RFC.  *See* R. 31, 36-38.  The ALJ's determination of Claimant's RFC is

thus supported by substantial evidence.

46.     The ALJ thereafter found that in light of his RFC finding, Claimant could not

return to any of his past relevant work.  R.37. Relying upon the testimony of the VE, Pamela

Bowman, the ALJ noted that Claimant's past work as a truck driver were medium exertional level

jobs. R. 37.  The ALJ correctly noted that the burden of proof thus shifted to the Commissioner

to show that the claimant's age, education, work history, and functional capacity permit a

successful adaption to a signification number of other jobs in the national economy.  *Id.*

47.     The ALJ noted that Claimant, at 47 years of age, is a younger person pursuant to

20 C.F.R. § 404.1563(b).  The ALJ further noted that Claimant has attained a high school

---

[8]      *Patton*, as an unpublished opinion, is not controlling law.

education, pursuant to 20 C.F.R. § 404.1564(b)(1).   However, as the ALJ noted, Claimant

challenged his actual educational achievement, claiming that he cannot read or write in English.

R. 37.

### Claimant's Alleged Illiteracy

48.     Illiteracy is defined in the regulations as: " . . . the inability to read or write. We

consider someone illiterate if the person cannot read or write a simple message such as

instructions or inventory lists even though the person can sign his or her name. Generally, an

illiterate is a person who has had little or no formal schooling."  20 C.F.R. § 404.1564(b)(1).

49.     Where the administrative record contains evidence pointing to the claimant's

ability to read, that evidence may be sufficient to support the ALJ's conclusion of functional

literacy.  *See Howard v. Massanari*, 255 F.3d 577, 585 (8th Cir. 2001)(wherein the Court noted

that where the claimant had passed the CNA test and had obtained a driver's license, a finding of

functional literacy was supported, although the tests may have been read to her).  Courts in the

past have found a finding of literacy supported by substantial evidence where the claimant "'had

completed either the fourth or fifth grade of elementary school or the sixth grade'" but "could not

read a newspaper, write a letter, or read the notice of hearing that the Social Security

Administration had sent him."  *Starks v. Sect'y of Health & Human Serv.,*, 873 F.2d 187, 189 (8th

Cir. 1989)(quoting *Glenn v. Sect'y of Health & Human Serv,*, 814 F.2d 387, 390-91 (5th Cir.

1986)). The Eighth Circuit, in *Starks*, upheld the finding of literacy wherein the claimant, who had

testified to taking an oral examination to obtain his driver's license, did not testify to having *"had*

*to"* take an oral examination.  *Starks*, 873 F.2d at 189-190 (emphasis in original).

50.     Claimant submitted a report by his vocational expert in support of his initial

application for disability, in 1990.  *See* R. 334-349.  Claimant's previous VE stated that Mr.

Garza "reports that he is now able to read some but cannot write well."  R. 335.   Claimant's VE

noted that Mr. Garza has average intellectual capacity.  R. 340.  Claimant's VE further noted that

pursuant to the Wide Range Achievement Test, Plaintiff scored at less than the third grade level in

spelling and reading.  R. 341.   Claimant's VE concluded that "Mr. Garza has average non-verbal

intelligence. . . . He is functionally illiterate with reading skills below the 3rd grade level.

Mathematical skills are borderline at the 6th grade level."  R. 343.

51.     Like the Claimant in the instant case, the claimant in *Starks* had been formally

educated in public schools through high school; and received scores "below a third grade

equivalent" on the reading section of a Wide Range Achievement Test. *Starks*, 873 F.2d at 190.

The Eighth Circuit noted that "a finding of literacy is warranted even when the claimant is able to

read and write only very simple messages." *Id*.

52.     In the instant case, Claimant completed the twelfth grade.   He has completed at

least one form, and perhaps others.   The ALJ specifically noted that Claimant was "less than

credible as to his abilities," referring to the conflicting information provided by Claimant about his

reading.  R. 38.   Although Claimant's previous VE characterized him as "functionally illiterate,"

there is substantial evidence to demonstrate that Claimant possesses the ability to write and

understand simple messages, the degree of literacy required by 20 C.F.R. § 404.1564(b)(1).

53.     The ALJ relied upon the testimony of the VE, Pamela Bowman, who was asked

whether any jobs in the regional and national economy for a person with the following vocational

profile:  the age, education, and vocational profile of the Claimant, including the ability to read

and understand simple messages.  R. 38.  The ALJ noted that the VE testified that such a

hypothetical individual "could make a satisfactory adjustment to the job of surveillance system monitor, for which there were a significant number of such jobs available in the regional and national economy." R. 38.

## Application of the GRIDS

54.     Claimant alleges that the ALJ erred in application of the GRIDS in determining that Claimant was not disabled.  Automatic application of the GRIDS is appropriate only when a claimant's residual functional capacity, age, work experience, and education precisely match a GRID category. *Gossett v. Bowen*, 862 F.2d 802, 806 (10th Cir. 1988)(citing *Heckler v. Campbell*, 461 U.S. at 462 n.5)(further internal citations omitted). In borderline situations, the GRIDS should not be mechanically applied.  *See, e.g., Daniels v. Apfel*, 154 F.3d 1129, 1135 (10th Cir. 1998).  When nonexertional limitations affect the range of activities that the claimant can participate in, the GRIDS can serve only as a framework to aid in determining whether sufficient jobs exist for a claimant, given his limitations and characteristics.  *Gossett v. Bowen*, 862 F.2d  at 806.

55.     In the instant case, the ALJ did not mechanically apply the GRIDS; rather the ALJ relied upon the testimony of the VE, who testified at the hearing.   *See* R. 577-588; R. 38.

## Reliance Upon the Testimony of the VE

56.     Claimant argues that the ALJ erred by (1) failing to adequately consider the vocational evidence presented by Claimant's VE Jarvis, by relying upon the testimony of VE Bowman, and by failing to consider the vocational evidence presented by Claimant's second VE Ken L. Williams.   I note at the outset that the evaluation by VE Williams that Claimant refers to does not appear in the Administrative Record.  Although Claimant states that the evaluation by

VE Williams "should have been considered by the Appeals Council," this evaluation is not listed as information provided by Claimant to the Appeals Council.  R. 6.  Court review is limited to determining whether the ALJ applied the correct legal standards and whether his findings are supported by substantial evidence *in the record* viewed as a whole.  *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)(emphasis supplied).  Although 20 C.F.R. 404.970(b) expressly authorizes submission of new evidence to the Appeals Council, it does not appear that the evaluation of VE Williams was provided to the Appeals Council.  *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994), which Claimant argues requires that this Court consider the evaluation of VE Williams, is inapposite in that it deals with consideration of evidence provided to the Appeals Council.  *See generally*, *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).   The evaluation by VE Williams to which Claimant refers does not appear in the Administrative Record, does not appear to have been provided to the Appeals Council, and may thus not be considered in determining whether the findings of the ALJ were supported by substantial evidence in the record viewed as a whole.

57.     Claimant also argues that the vocational findings by VE Jarvis negated the findings of VE Bowman and should have been incorporated in the hypothetical questions which the ALJ posed to VE Bowman at the hearing.    The ALJ propounded a hypothetical question to the VE that included all the limitations the ALJ ultimately included in his RFC assessment.  The ALJ considered the vocational evidence against provided by VE Jarvis against the evidence in the record as a whole.   As I noted above, there is substantial evidence to demonstrate that Claimant possesses the ability to write and understand simple messages, the degree of literacy required by 20 C.F.R. § 404.1564(b)(1), and the degree of literacy which the ALJ incorporated into the

25

hypothetical questions posed to VE Bowman at the hearing. Therefore, the VE's answer to that question provided a proper basis for the ALJ's disability decision. *Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000).

58.     Claimant further argues that Claimant is unable to do the job of surveillance systems monitor because of his academic deficits. Claimant notes that the description of surveillance system monitor contained in the <u>Dictionary of Occupational Titles</u> ("DOT") requires level three reasoning skills, level one math skills, level three language skills, and a general learning ability in the middle third of the population. Pl. Memo. at 13. Defendant notes that Claimant's past jobs required similar general education development and learning ability. Def. Memo. at 7-9. The ALJ did not question the VE or elicit additional information or testimony to reconcile the requirements of the job of surveillance systems monitor with the hypothetical questions posed to the VE and her responses. R. 579, 582, 585-588.

59.     The Third Circuit addressed a similar fact situation in *Donahue v. Barnhart,* 279 F.3d 441, 443-444 (3rd Cir. 2002). The claimant in *Donohue* was illiterate, had difficulty with social interactions and suffered from back pain. *Donobue*, 279 F.3d at 444. A VE testified that the Milwaukee area alone offered "some 5,000 janitorial jobs, 3,000 assembly jobs, and 1,500 hand-packing jobs that satisfy" claimant's limitations. On appeal, the claimant argued that the ALJ erred in accepting the testimony of the VE, because the ALJ contradicted the Department of Labor's Dictionary of Occupational Titles when testifying that an illiterate person could perform these jobs. *Id*. In addressing the conflict between the testimony of the VE and the DOT, the

Third Circuit noted:

> The conflict between the vocational expert's testimony and the Dictionary of
> Occupational Titles is not so easy to deal with. It turns out that whoever wrote the
> Dictionary believes that basic literacy (defined as a vocabulary of 2,500 words, the
> ability to read about 100 words a minute, and the ability to print simple sentences)
> is essential for every job in the economy, and that janitors require a higher level
> (the ability to read about 200 words per minute). . . . The vocational
> expert obviously did not agree--nor did [the claimant's] former employer, for he
> was no more literate during the 23 years he drove a garbage truck than he is today.
> Illiteracy is not  a progressive disease.

*Donohue*, 279 F.3d at 445.   The claimant in *Donohue*, like Claimant in this case, was represented

by counsel who failed to question the basis of the vocational expert's conclusions at the hearing.

*Id*. at 446.  The Third Circuit concluded that where the claimant questions the basis of the VE's

conclusions at the hearing, the ALJ should make an inquiry  to find out whether the purported

expert's conclusions are reliable, and to "explain [in the] determination or decision how any conflict

[with the Dictionary] that has been identified was resolved." *Donohue*, 279 F.3d at 446 (quoting

Social Security Ruling 00-4p).  The Third Circuit further noted that " [r]aising a discrepancy only

after the hearing is too late. . . . An ALJ is not obliged to reopen the record. On the record as it

stands--that is, with no questions asked that reveal any shortcomings in the vocational  expert's

data or reasoning--the ALJ was entitled to reach the conclusion she did." *Donohue*, 279 F.3d at

446.

60.    The Tenth Circuit has taken a somewhat different view, noting that "the Dictionary

[of Occupational Titles] uses a different and considerably more extensive classification scheme for

skill requirements than the agency's regulations. Section 404.1568 [ of 20 C.F.R.] indicates that an

ALJ should use information provided by the Dictionary to assess occupational skill requirements,

but it is evident that the Dictionary's information about skills must be massaged, if you will, into

27

the agency's three classifications (unskilled, semi-skilled, skilled)." *Haddock v. Apfel*, 196 F.3d

1084, 1089 (10th Cir. 1999).  In *Haddock*, the Tenth Circuit specifically rejected the approach

adopted by the Third Circuit, noting:

> To relieve the ALJ of the burden to thoroughly develop the vocational evidence at
> step five would shift the burden to the claimant in the form of a  requirement to
> cross-examine the vocational expert. To do so would contravene basic principles of
> social security law, however. First, it is not the claimant's burden to prove he cannot
> work at any level lower than his past relevant work; it is the agency's burden to
> prove that he can.  To allow an ALJ to elicit and rely on summary conclusions
> given by a VE, in the absence of contrary testimony elicited by the claimant through
> cross-examination, would amount to shifting the burden to produce and develop
> vocational evidence back to the claimant

*Haddock*, 196 F.3d at 1090.  While the Tenth Circuit did not hold that the Dictionary of

Occupational Titles "trumps" a VE's testimony when there is a conflict about the nature of a job,

the rule announced by the Court in *Haddock* requires "that the ALJ must investigate and elicit a

reasonable explanation for any conflict between the Dictionary and expert testimony before the

ALJ may rely on the expert's testimony as substantial evidence to support a determination of

nondisability." *Haddock*, 196 F.3d at 1091.   The record does not demonstrate that the ALJ

investigated or elicited a reasonable explanation for the apparent conflict between the testimony of

VE Bowman and the DOT.  On remand, the ALJ should reconsider whether there is a significant

number of specific jobs Mr. Garza could have done with his limitations.

### RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse or Remand the Administrative Agency

Decision filed July 8, 2002 *(Doc. 10)* be **GRANTED** and that this matter be **REMANDED** to the

Commissioner for the ALJ to reconsider whether there is a significant number of specific jobs Mr.

Garza could have done with his limitations**.**  Timely objections to the foregoing may be made

pursuant to 28 U.S.C. §636(b)(1)(C).  Within ten days after a party is served with a copy of these

proposed findings and recommendations that party may, pursuant to §636(b)(1)(C), file written

objections to such proposed findings and recommendations with the Clerk of the United States

District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102.  A party must file any objections

within the ten day period allowed if that party wants to have appellate review of the proposed

findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**